UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

**Melissa Liberi**

    v.                                    Case No. 19-cv-397-PB
                                           Opinion No. 2019 DNH 201
**Andrew Saul, Commissioner,**
**Social Security Administration**

**MEMORANDUM AND ORDER**

Melissa Liberi moves to reverse the decision of the Commissioner of the Social Security Administration ("SSA") to deny her applications for Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income ("SSI") under Title XVI, 42 U.S.C. § 1382. The Commissioner, in turn, moves for an order affirming his decision. For the reasons that follow, the decision of the Commissioner, as announced by the Administrative Law Judge ("ALJ"), is affirmed.

**I. SCOPE OF REVIEW**

I am authorized "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see also 42 U.S.C. § 1383(c)(3) (applying § 405(g) to SSI decisions). I "defer to the Commissioner's finding of facts,

1

so long as they are supported by substantial evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, ___ U.S. ___, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019). Substantial evidence requires "more than a mere scintilla" but not much more. Id. The standard demands merely "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).

The Commissioner's findings do not receive deference "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35. "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (internal quotation marks and brackets omitted) (quoting Rodriguez, 647 F.2d at

222). Barring "a legal or factual error in evaluating a particular claim[,]" Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885, 109 S. Ct. 2248, 104 L. Ed. 2d 941 (1989)), I "must uphold a denial of social security disability benefits," id.

## II. BACKGROUND

The parties have submitted statements of material facts, as required by Local Rule 9.1(b). Some of the relevant facts are set out in a previous decision from this court, Liberi v. Berryhill, No. 16-cv-476-JL, 2017 WL 4773336 (D.N.H. Sept. 15, 2017), R. & R. approved by 2017 WL 4773220 (D.N.H. Oct. 20, 2017). Those facts are not repeated here. Rather, this section focuses on facts that the previous decision did not recite or that developed after the previous decision was issued.

Liberi first applied for DIB and SSI in June of 2014. Administrative Transcript ("Tr.") at 17. In August of 2014, after performing a consultative examination on Liberi,[1] Dr. Sandra Vallery:

> diagnos[ed] Liberi with social anxiety, generalized anxiety disorder, and depressive disorder not otherwise

---

[1] "A consultative examination is a physical or mental examination or test purchased for [a claimant] at [the SSA's] request . . . ." 20 C.F.R. §§ 404.1519, 416.919.

specified [and] . . . prepared a Comprehensive
Psychological Profile that includes opinions on Liberi's
then-current level of functioning.

*Liberi*, 2017 WL 4773336, at *2. This is the only functional

deficit that Dr. Vallery identified:

> REACTION TO STRESS, ADAPTATION TO WORK OR WORK-LIKE
> SITUATIONS: This claimant is able to tolerate stressors
> common to the work environment. She can make simple
> decisions and interact appropriately with supervisors.
> She would have some difficulty maintaining consistent
> attendance given her anxiety.

Tr. at 380.

Liberi's 2014 applications were denied, and she received an

unfavorable decision from an ALJ. *Liberi*, 2017 WL 4773336, at

*1. She appealed that decision to this court, and her case was

remanded to the SSA because "the ALJ did not give good reasons

for discounting" the opinion of her treating psychiatrist, Dr.

Kenneth Cohen. *Id.* at *11. In her report and recommendation,

Magistrate Judge Andrea Johnstone noted:

> Dr. Cohen opined that Liberi had a "complete inability
> to function independently outside the area of her home,"
> and that she would miss more than four days of work per
> month due to her mental impairments. Either of those two
> opinions, if credited, would compel a determination that
> Liberi was disabled.

*Id.* at *6 (internal citations and brackets omitted).

On July 25, 2018, while this case was on remand to the SSA,

Dr. Cohen completed a Mental Impairment Questionnaire on Liberi.

Tr. at 739-44. He listed diagnoses of agoraphobia with panic

disorder and recurrent major depression. Tr. at 739. When asked

to describe "the <u>clinical findings</u> including results of mental status examination that demonstrate[d] the severity of [Liberi's] mental impairment and symptoms," Dr. Cohen wrote, "Avoids going out[,] avoids new experiences[.] Overwhelming panic attacks interrupting her life [and] causing further retreat[.] Episodic dips into depression[.]" Tr. at 739. With respect to functional limitations, Dr. Cohen opined that Liberi had: (1) no limitation on her ability to "[u]nderstand, remember or apply information;" (2) mild limitation[2] on her ability to "[c]oncentrate, persist, or maintain pace;" and (3) moderate limitation[3] on her abilities to "[i]nteract with others" and to "[a]dapt or manage" herself. Tr. at 741. Turning to the five "mental abilities and aptitudes needed to do particular types of jobs[,]" Dr. Cohen noted that Liberi had no limitations on one, mild limitations on one, moderate limitations on one, and marked limitations[4] on two ("[t]ravel[ing] in unfamiliar place[s]" and "[u]s[ing] public transportation"). Tr. at 741. As to the four

---

[2] The form that Dr. Cohen completed specifies that with a mild limitation, a "[p]atient's functioning . . . independently, appropriately, effectively, and on a sustained basis is slightly limited." Tr. at 741.

[3] The form that Dr. Cohen completed specifies that with a moderate limitation, a "[p]atient's functioning . . . independently, appropriately, effectively, and on a sustained basis is fair." Tr. at 741.

[4] The form that Dr. Cohen completed specifies that with a marked limitation, a "[p]atient's functioning . . . independently, appropriately, effectively, and on a sustained basis is seriously limited." Tr. at 741.

"mental abilities and aptitudes needed to do semiskilled and
skilled work[,]" Dr. Cohen determined that Liberi had no
limitation on any of them. Tr. at 742. Finally, with respect to
the sixteen "mental abilities and aptitudes needed to do
unskilled work[,]" Dr. Cohen indicated that Liberi had no
limitation on eleven, mild limitation on two, moderate
limitation on two, and marked limitation on only one
("[c]ompleting a normal workday and workweek without
interruptions from psychologically based symptoms"). Tr. at 742.
After identifying the foregoing limitations, Dr. Cohen
explained, "All workplace indicators [are] predicated on
remission of panic [and] agoraphobia. Ms. Liberi is very capable
when not impaired by panic [and] social anxiety." Tr. at 742.
Finally, Dr. Cohen anticipated that Liberi would be absent from
work "[m]ore than four days per month" because of her mental
impairments or treatment for them. Tr. at 743.

On January 4, 2019, Dr. Cohen wrote a letter to Liberi's
attorney which states, in full:

> I continue to treat Ms. Liberi for Panic Disorder with
> Agoraphobia and past episodes of Major Depression. She
> has been stabilized for both conditions with
> medication[,] however, her stability is easily disrupted
> when ordinary life stressors provoke anxiety.
>
> Ms. Liberi has episodic flairs [sic] of panic disorder
> and retreats into agoraphobic isolation. Maintaining
> consistent attendance, focus and concentration at work,
> school[,] or other scheduled activities will continue to

6

be interrupted into the future. These symptom flairs [sic] are still frequent.

The medication treatment does provide better stability[,] however, persistent symptom break through remains problematic. As a result, Ms. Liberi would fail at any job requiring consistent attendance and focus.

Tr. at 824.

On remand, the ALJ conducted a second hearing on January 29, 2019 at which he took telephonic testimony from Dr. Alfred Jonas, a psychiatrist who reviewed Liberi's medical records, but had never treated or examined her. See Tr. at 466–504. Dr. Jonas noted diagnoses of anxiety, depression, and "a rule[-]out of post-traumatic stress disorder." Tr. at 471.[5] Next he explained why, in his opinion, none of those impairments was severe enough to satisfy the criteria the SSA uses to determine whether a mental impairment is per se disabling. Tr. at 471–74.

Assessing the severity of Liberi's mental impairments, Dr. Jonas offered this testimony:

And [Dr. Cohen] also said that [Liberi] could not leave [her] house. There's nothing in the record that indicates that that would be true. She does not have a pattern of unkept appointments. She drove herself to the [consultative examination]. And, again, there's just nothing here that would leave us with a conclusion that she could not leave her house.

---

[5] "'Rule-out' in a medical record means that the disorder is suspected but not confirmed—i.e., there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." Byes v. Astrue, 687 F.3d 913, 916 n.3 (8th Cir. 2012) (citing United States v. Grape, 549 F.3d 591, 593 n.2 (3d Cir. 2008)).

Tr. at 474-75. With respect to the functional limitations that resulted from Liberi's mental impairments, Dr. Jonas opined that moderate interaction with others is

> the highest level of impairment that I could rate from this record and it's sort of questionable what to say about people who have a mild to moderate social impairment and the question would be could such a person deal with the general public in an unrestricted way? The record doesn't really give us much insight about that. The other question we might ask about somebody like that is would such a person have difficulty dealing with bosses or co-workers in settings that require higher levels of teamwork where an excellent ability to work with co-workers and bosses is centrally important to the task? And, again, this record does could not such give us any insight about whether the claimant would be impaired in doing that. Those would certainly be the possibilities, that she would have trouble in an unrestricted interaction with the general public or higher levels of teamwork, but I can't prove it to you from the record.

Tr. at 478-79.

Subsequently, Liberi's counsel elicited testimony from her concerning her purported inability to maintain consistent attendance at work. See Tr. at 494-95. On that same topic, Liberi's counsel asked Dr. Jonas whether, as indicated by Drs. Vallery and Cohen, Liberi's "experience of symptoms relating to [her mental health] diagnoses would interfere with her ability to consistently show up at a job." Tr. at 498. Dr. Jonas replied:

> Dr. [Vallery] would not be in a position to say that because Dr. [Vallery] scheduled to see the claimant one time and the claimant arrived on time. She drove herself. So Dr. [Vallery] does not have a direct personal reason to think that the claimant would have difficulty being

8

punctual and reliable. Dr. Cohen would be in a position
to do that if the doctor experienced that the claimant
did not reliably keep appointments, but the record does
not say that's true. So, again, for even Dr. Cohen, who
treats the claimant over time, to say that the claimant
could not be reliable is not founded on anything. It's
just, you know, unless [Liberi] said that . . . she felt
she couldn't be reliable, where things were too much of
a challenge, but it's not the reality that Dr. Cohen
experiences. It's what the claimant tells him.

Tr. at 498–99. Thereafter, Liberi testified that she had

rescheduled many office visits with Dr. Cohen, Tr. at 501, but

Liberi's counsel, in response to a question from the ALJ, could

not point to evidence in Dr. Cohen's records that corroborated

Liberi's testimony on that point, Tr. at 501–02.

After Dr. Jonas testified, the ALJ took testimony from a

vocational expert ("VE"). He began by asking the VE to

[a]ssume a hypothetical individual of the claimant's
same age . . . [,] education[,] and . . . past work . .
. [,] limited to . . . non-exertional [work, who] . . .
should have no interaction when it comes to the general
public and . . . should avoid higher levels of
cooperation in the workplace . . . with co-workers and
supervisors.

Tr. at 507–08. In response, the VE testified that such a

person could perform one of Liberi's past jobs—child

monitor—in addition to assembling circuit boards,

"inspecting plastic products[,]" and tending spooling

machines. Tr. at 508–09. Then the VE testified that those

positions would be precluded if the hypothetical

"individual would be off task up to 15 percent or more a

day based on mental health symptoms," Tr. at 509, or the "individual would miss more than four days a month on an ongoing and chronic basis . . . due to mental health symptoms," Tr. at 510.

After Liberi's hearing, the ALJ issued a decision in which he found that claimant had the severe mental impairments of anxiety and depression, but that neither of those impairments was severe enough to satisfy the criteria under which the SSA deems an impairment to be per se disabling. Tr. at 443–44. Accordingly, he went on to assess Liberi's residual functional capacity ("RFC").[6] He found that she had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never interact with the public [and] . . . should avoid work that involves higher levels of cooperation with coworkers and supervisors." Tr. at 446.

In determining Liberi's RFC, the ALJ (1) gave Dr. Cohen's "opinions little weight" on grounds that they were "neither well support[ed] nor consistent with the record," Tr. at 451; (2) gave "some weight" to Dr. Vallery's opinions on Liberi's mental

---

[6] "[R]residual functional capacity is the most [a claimant] can still do despite his or her limitations." Purdy, 887 F.3d at 10 n.2 (internal quotation marks and brackets omitted) (quoting 20 C.F.R. § 416.945(a)(1)) (evaluating RFC for SSI claims); accord 20 C.F.R. § 404.1545(a)(1) (evaluating RFC for DIB claims).

abilities, Tr. at 451, but "little weight" to her opinions on Liberi's potential job attendance, Tr. at 452; and (3) found "that the opinion of . . . Dr. Jonas [was] most persuasive as it [was] consistent with and supported by the objective medical evidence in the record," Tr. 452.

Finally, after determining that Liberi no longer had the RFC to perform her past work, Tr. at 453, the ALJ determined that she retained the RFC to perform the unskilled light-duty jobs of printed circuit board preassembler, "spooling machine operator[,]" and plastic products inspector, Tr. at 454. For that reason, the ALJ ruled that Liberi had "not been under a disability . . . from August 13, 2013, through the date of [his] decision" issued on February 13, 2019. Tr. at 454–55.

## III. DISCUSSION

### A.   The Legal Framework

A person is eligible for disability benefits when she (1) is insured for DIB; (2) has not reached retirement age; (3) has filed an application; and (4) is "under a disability." 42 U.S.C. § 423(a)(1)(A), (B), (D), (E). A person must be "aged, blind, or disabled" and must meet certain requirements pertaining to income and assets to be eligible for SSI. 42 U.S.C. § 1382(a)(1). At issue in this case is whether the ALJ correctly

determined that Liberi was not under a disability from August 13, 2013 through February 13, 2019.

An ALJ employs a five-step sequential evaluation process when determining whether a claimant is disabled in the context of DIB and SSI eligibility. See 20 C.F.R. §§ 404.1520 (applying to DIB eligibility), 416.920 (applying to SSI eligibility). The five steps are:

> 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's RFC] is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her [RFC], education, work experience, and age, is unable to do any other work, the application is granted.

Purdy, 887 F.3d at 10; accord 20 C.F.R. § 416.920.

The claimant "has the burden of production and proof at the first four steps of the process." [7] Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). She "must prove [she] is disabled by a preponderance of the evidence." Baillargeon v. Berryhill, 359 F. Supp. 3d 172, 179 (D.N.H. 2019). Finally, "in assessing a disability claim, the Commissioner considers objective and

---

[7] At step five, the burden of proof shifts to the Commissioner, Purdy, 887 F.3d at 10, however, the Commissioner's step-five determination is not at issue in this case.

subjective factors, including: (1) objective medical facts; (2) claimant's subjective claims of pain and disability as supported by the testimony of the claimant or other witness; and (3) the claimant's educational background, age, and work experience." Stratton v. Astrue, 987 F. Supp. 2d 135, 142 (D.N.H. 2012) (internal brackets omitted).

**B.    Liberi's Claims**

Liberi claims that the ALJ erred in assessing her RFC by (1) giving too much weight to the opinions of Dr. Jonas and too little weight to the opinions of Drs. Cohen and Vallery, Mem. in Supp. of Pl.'s Mot. for Order Rev'g the Decision of the Comm'r, Doc. No. 8-1 at 17, and (2) improperly evaluating her statements about her symptoms and their limiting effects, Doc. No. 8-1 at 21.

1.    Weighing the Medical Opinions

The ALJ generally gives the greatest weight to medical opinions from treating sources, lesser weight to the opinions of medical sources who have merely examined the claimant, and the least weight to opinions from those who have neither treated nor examined the claimant. See 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2).[8] Moreover, the ALJ gives "controlling weight"

---

[8] For applications filed on or after March 27, 2017, a new set of regulations governs the evaluation of medical opinions. See 20 C.F.R. §§ 404.1520c, 416.920c. Because Liberi filed her

to the opinion of a treating source if the ALJ "find[s] that a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record . . . ." Id. §§ 404.1527(c)(2); 416.927(c)(2). Regardless of whether an ALJ gives controlling weight to a treating source's opinion, he must "always give good reasons . . . for the weight [he] give[s] [a claimant's] treating source's medical opinion." Id. §§ 404.1527(c)(2); 416.927(c)(2). Good reasons "offer a rationale that could be accepted by a reasonable mind," Levesque v. U.S. Soc. Sec. Comm'n, Acting Comm'r, No. 18-cv-420-LM, 2019 WL 2004298, at *4 (D.N.H. May 7, 2019) (quoting Dimambro v. U.S. Soc. Sec. Admin., Acting Comm'r, No. 16-cv-486-PB, 2018 WL 301090, at *10 (D.N.H. Jan. 5, 2018)), and "are both specific . . . and supportable," Dimambro, 2018 WL 301090, at *10 (alternation in original)(citation omitted).

When evaluating a treating source's opinion that is not given controlling weight or any other medical opinion, the SSA considers the following factors: (1) the "[l]ength of the treatment relationship and the frequency of the examination[;]"

application for DIB and SSI benefits in June 2014, Tr. at 17, the previous regulations govern.

(2) the "[n]ature and extent of the treatment relationship[;]"
(3) the degree to which the "medical source presents relevant
evidence to support a medical opinion, particularly medical
signs and laboratory findings[;]" (4) the consistency of the
opinion "with the record as a whole[;]" (5) the specialization
of the medical source, if any; and (6) other factors, such as
"the amount of understanding of [the SSA's] disability programs
and their evidentiary requirements that a medical source has . .
. . " 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Having described the operative legal principles, I turn to
the ALJ's assessments of the three medical opinions that Liberi
alleges he misevaluated.

### a. Dr. Cohen

The ALJ began by noting that Dr. Cohen had completed
mental-impairment questionnaires in 2015 and 2018 and had
written the aforementioned letter in 2019. Tr. at 450. The ALJ
also acknowledged Dr. Cohen's specialization as a psychiatrist,
and his long-term treating relationship with Liberi. Tr. at 450.
The ALJ went on to give Dr. Cohen's opinions "little weight[,]"
however, because "they [were] not well supported nor consistent
with the evidence in the record." Tr. at 450.

With respect to the support proffered by Dr. Cohen, the ALJ
pointed out that where the mental impairment questionnaires
asked for clinical findings, Dr. Cohen responded by citing

15

nothing more than Liberi's subjective statements about her symptoms. Tr. at 450. He also pointed out that while Dr. Cohen opined that Liberi would miss more than four days of work per month due to her mental impairments or treatment for them, Dr. Cohen's treatment records included no objective first-hand evidence, such as a history of missed or rescheduled appointments, to support that opinion. Tr. at 451. Instead, he seemingly relied on Liberi's subjective statements as the basis for that opinion.[9] Tr. at 451. Vis-à-vis the consistency with the record as a whole, the ALJ noted Liberi's "primarily benign mental status examinations, the primarily normal examination findings of consultative examiner Dr. Vallery, and the claimant's own reports of fairly extensive activities of daily living," providing extensive citations to the record. Tr. at 451.

Liberi provides four grounds in support of her argument that the ALJ erroneously discounted Dr. Cohen's opinions. First, she argues that the ALJ "failed to consider that Dr. Cohen's opinions were based . . . upon a diagnosis of panic disorder with agoraphobia," a diagnosis that Dr. Jonas did not

[9] "Statements in a medical record that merely repeat a claimant's subjective complaints are not medical opinions . . . ." Tann v. Berryhill, No. 16-cv-449-JD, 2017 WL 1326235, at *5 n.6 (D.N.H. Apr. 10, 2017).

acknowledge when evaluating Dr. Cohen's opinions. Doc. No. 8-1 at 17. Second, the ALJ conflated "the absence of evidence" with "conclusive evidence" that Liberi would not struggle with attendance at work, thereby agreeing with Dr. Jonas that "Dr. Cohen had not cited adequate objective evidence to support his opinions . . . ." Doc. No. 8-1 at 17. Third, the ALJ violated the so-called treating-physician rule. Doc. No. 8-1 at 17–18; see also Purdy, 887 F. 3d at 13 n.8 (acknowledging the "treating-physician rule" and its inapplicability to "claims filed on or after March 27, 2017"). Fourth, "the ALJ did not give adequately specific reasons" for discounting Dr. Cohen's opinions. Doc. No. 8-1 at 18. I am not persuaded by any of those arguments.[10]

First, with respect to the diagnosis of panic disorder with agoraphobia, the absence of those words from Dr. Jonas's testimony is of no moment. The ALJ devoted considerable attention to agoraphobia in his discussion of step two. See Tr. at 444–45. At step three, both Dr. Jonas and the ALJ considered

_____

[10] The persuasiveness of Liberi's argument is compromised by its brevity. After setting out the applicable legal principles, the "Legal Argument" section of Liberi's memorandum of law regarding the weight of the medical evidence consists of a seven-and-one-half-page description of Dr. Jonas's testimony, a five-and-one-half-page description of the ALJ's evaluation of the medical opinions, and four or five one-sentence legal arguments supported by a single citation of authority. Doc. No. 8-1 at 3–19.

the SSA's Listing 12.06, e.g., Tr. at 444, 471, which is labeled "anxiety and obsessive-compulsive disorders" and expressly covers panic disorder and agoraphobia. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.06.

Second, Liberi argues that the ALJ erred by agreeing with Dr. Jonas that Dr. Cohen had not cited objective evidence in support of his opinion that she would miss four or more days of work per month. Liberi does not, however, identify any objective evidence that Dr. Cohen cited but the ALJ overlooked. Rather, she argues, in a single sentence and without any citation to authority, that the ALJ erred by relying on the fact that Dr. Cohen's treatment notes showed no cancellations by Liberi to support his finding that Dr. Cohen's opinion on Liberi's impairments' influence on her probable employment attendance record lacked objective support. See Doc. No. 8-1 at 17. Liberi identifies no legal error in the ALJ's reasoning on this point, and I find none.

Third, in another one-sentence argument, Liberi contends that "[b]y giving greater weight to the opinion of Dr. Jonas . . ., the ALJ erroneously acted in contradiction to the Commissioner's applicable regulations stating that greater weight is to be given to the opinions of treating and examining sources than to those of non-examining reviewing sources." Doc. No. 8-1 at 17–18. Liberi says nothing at all, however, about the

ALJ's application of the factors set out in 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6), which ALJs are directed to use when weighing medical opinions. Thus, Liberi's argument is nothing more than an assertion that the opinions of treating sources are <u>always</u> unconditionally entitled to greater weight than the opinions of non-examining sources. But that is not the law. <u>See, e.g.</u>, id. § 404.1527(c)(2) (applying set of factors "in determining the weight to give the medical opinion" of a treating source when the source's opinion is not given controlling weight). Because Liberi does not challenge the ALJ's application of the factors set out in 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6), and because I find no error in the ALJ's analysis, her third argument fails.

Finally, I cannot agree with Liberi's fourth argument, <u>i.e.</u>, that the ALJ failed to give adequately specific reasons for discounting Dr. Cohen's opinion. To the contrary, the ALJ covered nearly all of the factors listed in 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6) and provided extensive citations to the record. Tr. at 446–53. Furthermore, notwithstanding Liberi's argument to the contrary, the ALJ's decision in this appeal is far more specific than the decision that was reversed in Liberi's first appeal.

Moreover, to the extent that Liberi faults the ALJ for his reliance upon the lack of evidence of missed appointments in Dr.

Cohen's treatment notes, that negative evidence is very different from the negative evidence that Magistrate Judge Johnstone found problematic in Liberi's first appeal. There, Magistrate Judge Johnstone disallowed the ALJ's reliance on "the absence of any recommendation by Dr. Cohen that Liberi engage in more frequent treatment and/or a different kind of treatment" as an unqualified assessment of treatment decisions by the ALJ. Liberi, 2017 WL 4773336, at *8. Here, by contrast, the ALJ considered the lack of notations indicating that Liberi missed or rescheduled any of her appointments with Dr. Cohen by explaining at Liberi's hearing that he had "read many medical records in [his] lifetime and they always say a no-show or a cancellation" when a patient misses an appointment. Tr. at 502. Unlike the negative evidence the ALJ relied on in his first decision, the negative evidence he relied on in his second decision did not put him in the position of making "an appraisal of a medical professional's decisions as to the form or frequency of the treatment that he has provided." Liberi, 2017 WL 4773336, at *8.

In sum, because the ALJ provided good reasons for affording little weight to Dr. Cohen's opinions, nothing in the ALJ's evaluation of those opinions gives me a reason to remand this matter.

### b. Dr. Vallery

In yet another undeveloped argument, Liberi claims that the ALJ erred by giving insufficient weight to Dr. Vallery's opinion on Liberi's capacity for regular job attendance. See Doc. No. 8-1 at 16. After acknowledging Dr. Vallery's status as a non-treating examining source, the ALJ noted that she "provide[d] no reference either to her own examination findings nor the record in support for" the proposition that Liberi "would have some difficulty maintaining consistent attendance due to anxiety," Tr. at 451, and that her "opinion [was] not sufficiently detailed to determine the amount of difficulty" Liberi would face in this regard, Tr. at 452. The ALJ concluded, "Given that this portion of Dr. Vallery's opinion is not well supported, is inconsistent with the record, and lacks detail as to the extent of the limitation, [I have] given it little weight." Tr. at 452.

Although Liberi claims that the ALJ erred by discounting Dr. Vallery's opinion, she stops with that bare assertion, and says nothing to call into question the validity of the ALJ's analysis. Similar to his analysis of Dr. Cohen's opinion, the ALJ considered the factors set out in 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6) and provided substantial evidence in support of his conclusion. Tr. at 450–51. The ALJ's evaluation of Dr. Vallery's opinion provides no grounds for remanding this matter.

### c. Dr. Jonas

Liberi also claims that the ALJ gave too much weight to the opinion of Dr. Jonas. But rather than pointing to a specific error in the ALJ's evaluation of Dr. Jonas's opinions, Liberi rests her claim on Dr. Jonas's purported failure to address her diagnosis of panic disorder with agoraphobia and offers only a brief citation to the treating-physician rule. See Doc. No. 8-1 at 17–19. For the reasons I have already explained, neither of those arguments has merit. Furthermore, as with his evaluation of the opinions of Drs. Cohen and Vallery, the ALJ's evaluation of Dr. Jonas's opinions considered the factors set out in 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6) and rested upon substantial evidence in the record. Tr. at 449–50. Accordingly, the ALJ's evaluation of Dr. Jonas's opinions provides no grounds for remanding this matter. In sum, when the ALJ evaluated the opinions of Drs. Cohen, Vallery, and Jonas, he considered the relevant factors, supported his evaluations with substantial evidence, and committed no reversible error.

### 2. Evaluating Liberi's Statements

The principles that guide an ALJ's evaluation of a claimant's statements about her symptoms are set out in Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016). SSR 16-3p explains that "an individual's statements of symptoms alone are not enough to establish the existence of a physical or

mental impairment or disability" and goes on to outline a "two-step process" for evaluating a claimant's statements. SSR 16-3p, 2016 WL 1119029, at *2.

> First, [the ALJ] must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . .

Id. at *2. At the second step, when

> considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ should] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

Id. at *4. An ALJ should "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." Id. at *5. Finally, an ALJ should also consider the following seven factors when evaluating a claimant's statements about her symptoms: (1) her "daily activities;" (2) "[t]he location, duration, frequency, and intensity of . . . [her] symptoms;" (3) "[f]actors that precipitate and aggravate the symptoms;" (4) "[t]he type,

dosage, effectiveness, and side effects of any medication [she]
takes or has taken to alleviate . . . [her] symptoms;" (5)
"[t]reatment, other than medication, [she] receives or has
received . . . ;" (6) "[a]ny measures other than treatment [she]
uses or has used to relieve . . . [her] symptoms . . . ;" and
(7) any other relevant factors. Id. at *7; accord 20 C.F.R. §§
404.1529(c)(3), 416.929(c)(3).

In his decision, the ALJ described Liberi's statements
about her symptoms this way:

> The claimant testified that her mental impairments
> prevent her from working. She said that she wakes up
> with a sense of overwhelming anxiety, fear of the
> unknown, and a lack of appetite. She says that some
> nights she is unable to sleep at all due to her symptoms.
> She indicated that she has periods of total agoraphobia
> where she is fearful of leaving the safety of her home
> at all and even walking to her mailbox is a challenge.
> She said that due to her symptoms she would be unable to
> maintain a regular full-time work schedule.

Tr. at 446 (citation omitted). After "find[ing] that [Liberi's]
medically determinable impairments could reasonably be expected
to cause [her] alleged symptoms," Tr. at 446, the ALJ concluded
"that [her] testimony regarding her symptoms and limitations
[was] entirely consistent with the evidence in the record," Tr.
at 448. In support of that determination, the ALJ pointed to
"[t]he primarily benign mental status examinations performed
during the relevant period[,]" "the primarily conservative
nature of [Liberi's] medical treatment during the relevant

period[,]" and her "failure to follow treatment recommendations

. . . . " Tr. at 448. Furthermore, the ALJ noted that Liberi's

"own reports regarding her activities of daily living[,]

suggest[ed] an ability on her part to interact socially in

excess of the ability [she] testified to at [her] hearing." Tr.

at 449.

Liberi argues that the ALJ erred in evaluating her

statements about her symptoms because he disregarded her

statements as unsubstantiated by the objective medical evidence

presented, "failed to explore the issue of whether [she] had

indeed sought treatment with other providers that were covered

by Medicaid through her testimony at the hearing," neglected to

correlate her emergency room visit to the "exacerbation of her

symptoms," and

> failed to consider, as required by SSR 16-3p, that
> symptoms, especially those due to mental impairments,
> may increase or decrease at various times, and thus that
> reports of activities of daily living may at times be
> inconsistent with [her] ability to sustain activities on
> a consistent basis in a workplace setting.

Doc. No. 8-1 at 21. I do not agree.

First, Liberi's claim that the ALJ disregarded her

statements because they were not substantiated by the objective

medical evidence is simply incorrect.[11] As I have already noted,

---

[11] Liberi prefaces her argument on this point with a quote from
the section of the ALJ's decision in which he explained why he
gave more weight to Dr. Jonas's opinions than he gave to the

the ALJ relied upon at least two other factors listed in SSR 16-3p: the nature of the treatment Liberi has received and her daily activities. Thus, Liberi's first argument fails.

Her second argument is no more persuasive. One of the reasons the ALJ gave for discounting Liberi's statements was his finding that "from February 2017 through February 2018, [she] did not receive any ongoing treatment for [her] condition." Tr. at 448. He explained further that Liberi

> testified that she remained in phone contact with Dr. Cohen and he continued to provide refills of her medications, but there were no office visits and no evidence of any medication adjustments during this period. [She] testified that the lack of treatment was related to the cost of visits with Dr. Cohen . . . [and] reported that she does have Medicaid coverage and thus, could have sought treatment with another provider although there is no evidence she did so.

Tr. at 448 (citation omitted). Liberi claims that the ALJ committed reversible error by failing to ask her whether she sought treatment with a provider who accepted Medicaid patients when she was not seeing Dr. Cohen. I disagree.

SSR 16-3p explains that "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . [an ALJ]

---

opinions of Drs. Vallery and Cohen. The sentence she quoted had nothing to do with the ALJ's evaluation of her statements about her symptoms, however, and was not an indication that the ALJ discounted her statements solely because of the lack of substantiation from the objective medical evidence.

may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2016 WL 1119029, at *8. At the hearing, an ALJ "may need to . . . ask why [the claimant] has not . . . sought treatment in a manner consistent with his or her complaints." Id. at *8. Notwithstanding Liberi's assertion to the contrary, SSR 16-3p does not require the ALJ to ask Liberi whether she had sought treatment with providers who accept Medicaid patients. Moreover, Liberi was represented by counsel at her hearing, so if Liberi had sought treatment with providers who accept Medicaid patients, which she does not allege she did, her counsel could have elicited that fact from her at her hearing. Accordingly, I am not persuaded by Liberi's second argument.

Liberi's third argument is that the ALJ "erroneously found that she had never reported to an emergency room due to exacerbation of her symptoms." Doc. No. 8-1 at 21 (emphasis added). To the contrary, the ALJ acknowledged that Liberi "reported to the emergency room on one occasions [sic] due to symptoms and it was because Dr. Cohen was on vacation. Otherwise, the claimant has not reported to the emergency room or required psychiatric hospitalization." Tr. at 447 (citation omitted). Thus, Liberi is mistaken in asserting that the ALJ found that she had never reported to the emergency room; he

found that she went to the emergency room once, which is exactly the number of emergency room visits she alleges in her memorandum of law. See Doc. No. 8-1 at 21. Because the record contradicts the factual basis relied upon for claimant's third argument, that argument fails.

Finally, Liberi claims that the ALJ erred by failing to consider that mental-health symptoms "may increase or decrease at various times . . . ." Doc. No. 8-1 at 21. The ALJ expressly stated, however, that Liberi "reported waxing and waning periods of anxiety during the relevant period," Tr. at 448, clearly negating Liberi's contrary assertion. Therefore, her fourth argument also fails.

In sum, nothing in the ALJ's evaluation of Liberi's statements about her symptoms runs afoul of the principles set out in SSR 16-3p. Thus, Liberi's second claim gives me no grounds for remanding this matter.


## IV. CONCLUSION

Because the ALJ has committed neither a legal nor a factual error in evaluating Liberi's claims, see Manso-Pizarro, 76 F.3d at 16, I deny her motion for an order reversing the Commissioner's decision (Doc. No. 8), and I grant the Commissioner's motion for an order affirming his decision (Doc.

No. 9). The clerk of the court shall enter judgment in favor of the Commissioner and close the case.

       **SO ORDERED.**

                                     /s/ Paul J. Barbadoro
                                     Paul J. Barbadoro
                                     United States District Judge

December 2, 2019

cc:  D. Lance Tillinghast, Esq.
     Rami M. Vanegas, Esq.